# EXHIBIT A



# Notice of Service of Process

**null / ALL**
**Transmittal Number: 28115195**
**Date Processed: 12/05/2023**

| | |
|---|---|
| **Primary Contact:** | Sheryl Arneson<br>3M Company<br>3M Center<br>Bldg 220-9E-02 220-10W/F06<br>Saint Paul, MN 55144-1000 |
| **Electronic copy provided to:** | Canhnha Luu<br>Cheryl Muellner |

| | |
|---|---|
| **Entity:** | 3M Company<br>Entity ID Number  3571748 |
| **Entity Served:** | 3M Company |
| **Title of Action:** | Jon R. Noland vs. Energizer Auto Manufacturing, Inc. As successor-in-interest to Stp Products Manufacturing Company, d/b/a STP |
| **Matter Name/ID:** | Jon R. Noland vs. Energizer Auto Manufacturing, Inc. As successor-in-interest to Stp Products Manufacturing Company, d/b/a STP (14939231) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | Cook County Circuit Court, IL |
| **Case/Reference No:** | 2023L011696 |
| **Jurisdiction Served:** | Illinois |
| **Date Served on CSC:** | 12/05/2023 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Gianaris Trial Lawyers, LLC<br>618-619-0010 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882  |  sop@cscglobal.com

aring Date: No hearing scheduled
ocation: 12CV6598 Document #: 1-1 Filed: 12/07/23 Page 3 of 87 PageID #:15
learing Date: No hearing scheduled
udge: Calendar, H
 location: No hearing scheduled

FILED
11/30/2023 5:06 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L011696
Calendar, H
25412585

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |

Summons - Alias Summons                    (08/01/18) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Jon R. Noland,
_____
                         (Plaintiffs)

                v.

Case No.  2023L011696

Shell USA, Inc., et al.,
_____

Defendant.

☑ **SUMMONS**  ☐ **ALIAS SUMMONS**

To each Defendant:  **3M Company**
**Registered Agent:  Illinois Corporation, 801 Adlai Stevenson Drive, Springfield, IL 62703**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service.  To file your answer or appearance you need access to the internet.  Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

DEC 0 5 2023

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 3

**Summons - Alias Summons** (08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 6237156

Atty Name: Ted Gianaris,
Gianaris Trial Lawyers

Atty. for: Plaintiff

Address: One Court Street

City: Alton

State: IL    Zip: 62002

Telephone: 618-619-0010

Primary Email: lrippeto@lawforpeople.com

11/30/2023 5:06 PM IRIS Y. MARTINEZ

Witness: _____

Iris Y. Martinez, Clerk of Court

DEC 0 5 2023

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

○ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

### Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

Il other Civil Motions (Jury or Bench) shall be presented to the head via Zoom.
or more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
ourt Date: 1/18/2024 9:00 AM

Civil Motion Injury or Bench Case No 2023L011696 Filed: 12/07/23 Page 6 of 87 PageID #:18

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

FILED
11/16/2023 4:41 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L011696
Calendar, H
25246864

Jon R. Noland

v.

Shell USA, Inc., et. al,

No. **2023L011696**

## CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ☐ Yes ☐ No

**(FILE STAMP)**

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☒ 049 Product Liability
- ☐ 051 Construction Injuries
   (including Structural Work Act, Road
   Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
   (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

By: Ted Gianaris - Gianaris Trial Lawyers

(Attorney)          (Pro Se)

### COMMERCIAL LITIGATION
CASE TYPES:
- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice
   (other than legal or medical)
- ☐ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
   (Please specify below.**)
- ☐ 075 Other Commercial Litigation
   (Please specify below.**)
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS
CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery
- ** _____
- _____

Primary Email: tgianaris@lawforpeople.com

Secondary Email: lrippeto@lawforpeople.com

Tertiary Email: jedelson@lawforpeople.com

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice form the **Clerk's Office** for this case at this email address: _____

## IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILED
10/16/2023 4:41 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L011696
Calendar, H

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT , LAW DIVISION

| | |
|---|---|
| Jon R. Noland, | ) |
| | ) |
| Plaintiff, | )       2023L011696 |
| | ) |
| vs. | )   Case No.: 2023-LA-_____ |
| | ) |
| Energizer Auto Manufacturing, Inc. as | ) |
|    successor-in-interest to STP Products | ) |
|    Manufacturing Company, d/b/a STP, | ) |
| Safety-Kleen Systems, Inc., | ) |
| Shell USA, Inc., | ) |
| Monsanto Company, | ) |
| Lowes Home Centers, LLC, | ) |
| Menard, Inc., | ) |
| Home Depot U.S.A., Inc., | ) |
| Deere & Company, | ) |
| R.J. Reynolds Tobacco Company, | ) |
| 3M Company, | ) |
| Chevron U.S.A., Inc., | ) |
| Marathon Petroleum Company, | ) |
| Union Carbide Corporation, | ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

Plaintiff, Jon R. Noland ("Plaintiff"), by and through his attorney, Ted N. Gianaris and

Joshua A. Edelson of Gianaris Trial Lawyers, LLC, states and alleges as follows for his Complaint

against Defendants named herein:

### GENERAL ALLEGATIONS

1.      Plaintiff currently resides in Cordova, Illinois.

2.      This is a case for damages based on Plaintiff's Chronic Lymphocytic Leukemia

("CLL") diagnosis on November 26, 2021, that was caused or contributed to by exposures to

cancer-causing chemicals in products manufactured, sold, distributed, marketed, designed,

supplied, and/or used by Defendants.

3.     This Court has jurisdiction over because Plaintiff was exposed to and/or purchased the cancer-causing chemicals in the State of Illinois.

4.     Plaintiff worked at Deere & Company in East Moline, Illinois from 1965 to 1984.

5.     Plaintiff was in the Army, both active and reserve, from 1965 until 2007 and was stationed on different bases, including the Arlington Heights Reserve Center in Arlington Heights, Cook County, Illinois, where he was exposed to many cancer-causing substances that were designed, manufactured, supplied, and/or sold by the Defendants named herein.

6.     Plaintiff was exposed to, inhaled, ingested, and/or otherwise absorbed cancer-causing chemicals including glyphosate, and aromatic hydrocarbons and volatile organic compounds including solvents, benzene, ethylbenzene, toluene, xylene, and diesel fuel (collectively, "VOCs") and were manufactured, sold, distributed, marketed, designed, supplied, and/or used by the VOC Defendants named below.

7.     Said glyphosate was the active ingredient in the herbicides Roundup® that Plaintiff worked with, around, and purchased for his own personal use that were manufactured, sold, distributed, marketed, designed, and/or supplied by Monsanto Company, Lowes, Home Depot, and Menards.

8.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group further concluded that CLL is a type of cancer most associated with glyphosate exposure, especially for those who, like Plaintiff, were licensed herbicide applicators.

9.     The U.S. Department of Health & Human Services (DHHS)'s Agency for Toxic Substances and Disease Registry (ATSDR) and Environmental Protection Agency (EPA)

published a "Toxicological Profile for Glyphosate" that linked exposure to glyphosate to an increased risk of CLL.

10.    The IARC Working Group has also concluded that CLL is a type of cancer most associated with benzene exposure, especially for those who worked in gasoline-related industries, were gas station employees, and were exposed to VOCs.

11.    Plaintiff was also exposed to toxic PFAS chemicals that were excessively leaked and dumped into the air and surface/ground/drinking where Plaintiff lived in Cordova, Illinois by 3M Company at its facility in Cordova, Illinois.

12.    In 1959, Plaintiff smoked his first cigarette, Newport brand, that was designed, manufactured, advertised, marketed, distributed, and sold by R.J. Reynolds Tobacco Company, and immediately became addicted until cessation in 1966.

13.    The Newport branded cigarette product designed, manufactured, advertised, marketed, distributed, and sold by R. J. Reynolds Tobacco Company that Plaintiff began to smoke in 1959 did not contain any warnings whatsoever.

14.    As a direct and proximate result of said exposure to glyphosate, tobacco smoking, and/or VOCs, Plaintiff contracted CLL, suffered damages therefrom, and subsequently thereto became aware that the same was wrongfully caused.

15.    Defendant, Deere & Company, is a corporation with its principal place of business located within the State of Illinois.

16.    Venue in this matter is proper in the Circuit Court of Cook County, Illinois, pursuant to 735 ILCS 5/2-101 (1), in that, at all relevant times herein, Shell USA, Inc., Home Depot U.S.A., Inc., Lowes Homes Centers, LLC, and Menard, Inc. were and are residents, for the purposes of 735 ILCS 5/2-102(a), of Cook County, Illinois in that each maintains a fixed place of

business at which the affairs of the defendant are conducted in furtherance of a defendant's corporate activity.

17.     Venue in this matter is also proper in the Circuit Court of Cook County, Illinois, pursuant to 735 ILCS 5/2-101 (2), in that, at all relevant times herein, it is the county in which the transactions/exposures, or some part thereof, occurred out of which this cause of action arises.

**COUNT 1**
**ENERGIZER AUTO MANUFACTURING, INC., AS SUCCESSOR-IN-INTEREST TO**
**STP PRODUCTS MANUFACTURING COMPANY, *D/B/A* STP**
**(VOC-Product Liability: Negligence)**

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      At all times herein set forth, Defendant, Energizer Auto Manufacturing, Inc., as successor-in-interest to STP Products Manufacturing Company, *d/b/a* STP ("STP"), manufactured, sold, distributed, or supplied materials/products containing VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by STP. These materials and/or products included, but are not limited to, the sale, manufacture, distribution, and/or supply of: brake, carburetor and choke cleaners, engine treatments, fuel system cleaners, oils, greases, degreasers, solvents, cleaners, starting fluids, parts washing solvents, penetrating oils, mastics, epoxies, adhesives, and raffinate.

3.      Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by STP.

4.      STP knew or should have known the VOCs contained in their materials/products were hazardous and had a toxic, poisonous, and highly deleterious effect upon the health of

persons, such as Plaintiff, inhaling, ingesting, absorbing through the skin or otherwise absorbing them.

5.     Plaintiff was unaware of the hazards of exposure to VOCs, specifically the effects of long-term exposure.

6.     At all times herein relevant, STP had a duty to exercise reasonable care and caution for the safety of Plaintiff and others who worked with and/or around said materials/products.

7.     STP failed to exercise ordinary care and caution for the safety of Plaintiff in one or more of the following respects:

> a) Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, even though it was completely foreseeable and could or should have been anticipated that persons, such as Plaintiff, working with or around them would inhale, ingest or otherwise absorb VOCs;
>
> b) Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, when this Defendant knew or should have known that the same would have a toxic, poisonous and highly deleterious effect upon the health of persons, such as Plaintiff, inhaling, ingesting or otherwise absorbing it;
>
> c) Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of the same, when adequate substitutes were available;
>
> d) Failed to provide any or adequate warnings to persons, such as Plaintiff, working with and around their VOC containing products/materials of the dangers of inhaling, ingesting or otherwise absorbing the same;
>
> e) Failed to provide any or adequate instructions concerning safe and/or safer methods of working with and around VOCs, and VOC-containing materials/products to Plaintiff and others similarly situated, including specific instructions on how to avoid inhaling, ingesting, or otherwise absorbing the same; and/or,
>
> f) Failed to conduct tests on their respective materials/products containing VOCs to determine the hazards to which persons, such as Plaintiff, who might be exposed while working with and around the same.

8.     As a direct and proximate result of one or more of the foregoing acts or omissions on the part of STP, Plaintiff was exposed to and inhaled, ingested, or otherwise absorbed VOCs in a sufficient amount to cause or substantially contribute to Plaintiff' CLL.

9.     As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, Plaintiff developed CLL.

10.     As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Energizer Auto Manufacturing, Inc., as successor-in-interest to STP Products Manufacturing Company, *d/b/a* STP, jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

**COUNT 2**
**ENERGIZER AUTO MANUFACTURING, INC., AS SUCCESSOR-IN-INTEREST TO STP PRODUCTS MANUFACTURING COMPANY, *D/B/A* STP .**
**(Strict Liability)**

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all times herein set forth, STP manufactured, sold, distributed, or supplied materials/products containing VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by STP. These materials and/or products included, but are not limited to, the sale, manufacture, distribution, and/or supply of: brake, carburetor and choke cleaners, engine treatments, fuel system cleaners, oils, greases, degreasers, solvents, cleaners, starting fluids, parts washing solvents, penetrating oils, mastics, epoxies, adhesives, and raffinate.

3.      Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by STP and said materials/products were in a defective and unreasonably dangerous condition at the time they left the control of STP in that:

    a) they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were not accompanied by any, or adequate, warnings or instructions regarding the hazards associated with the regular, expected and intended use of said materials/products and/or any such warning or instructions were not adequate; and/or,

    b) they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were more dangerous than an ordinary consumer would anticipate.

4.      Said materials/products/equipment reached the end-users and the point of exposure in substantially the same condition as when they left the control of STP.

5.      At all relevant times, said materials/products were used by Plaintiff in the manners and environments anticipated, expected, and intended by STP, and which were reasonably foreseeable to STP.

6.      As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Energizer Auto Manufacturing, Inc., as successor-in-interest to STP Products Manufacturing Company, *d/b/a* STP, jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 3
## SAFETY-KLEEN SYSTEMS, INC.
### (VOC-Product Defendant: Negligence)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all times herein set forth, Defendant, Safety-Kleen Systems, Inc. ("Safety-Kleen"), manufactured, sold, distributed, or supplied materials, products and/or equipment containing and emitting VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by Safety-Kleen. These materials, products, and/or equipment included, but are not limited to, the sale, manufacture, distribution, and/or supply of: thinners, mineral spirits, solvents, degreasers, parts cleaners, parts and/or tool washing solvents, and/or parts and/or tool washing equipment.

3.     Plaintiff's exposure to and inhalation, ingestfion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by Safety-Kleen.

4.     Safety-Kleen knew or should have known the VOCs contained in their materials/products/equipment were hazardous and had a toxic, poisonous, and highly deleterious effect upon the health of persons, including Plaintiff, inhaling, ingesting, absorbing through the skin or otherwise absorbing them.

5.     Plaintiff was unaware of the hazards of exposure to VOCs, specifically the effects of long-term exposure.

6.     At all times herein relevant, Safety-Kleen had a duty to exercise reasonable care and caution for the safety of Plaintiff and others who worked with and/or around said materials/products/equipment.

7.     Defendant Safety-Kleen Systems failed to exercise ordinary care and caution for the safety of Plaintiff in one or more of the following respects:

    a) Included VOCs and/or VOC-containing ingredients in their materials, products, and/or equipment, and/or specified the use of VOC's, even though it was completely foreseeable and could or should have been anticipated that persons, such as Plaintiff, working with or around them would inhale, ingest or otherwise absorb VOCs;

    b) Included VOCs and/or VOC-containing ingredients in their materials, products, and/or equipment, and/or specified the use of VOCs, when this Defendant knew or should have known that the same would have a toxic, poisonous and highly deleterious effect upon the health of persons, such as Plaintiff, inhaling, ingesting or otherwise absorbing it;

    c) Included VOCs and/or VOC-containing ingredients in their materials, products, and/or equipment, and/or specified the use of the same, when adequate substitutes were available;

    d) Failed to provide any or adequate warnings to persons, such as Plaintiff, working with and around their VOC containing products/materials of the dangers of inhaling, ingesting or otherwise absorbing the same;

    e) Failed to provide any or adequate instructions concerning safe and/or safer methods of working with and around VOCs, and VOC-containing materials/products/equipment to Plaintiff and others similarly situated, including specific instructions on how to avoid inhaling, ingesting, or otherwise absorbing the same; and/or,

    f) Failed to conduct tests on their respective materials/products/equipment containing VOCs to determine the hazards to which persons, such as Plaintiff, who might be exposed while working with and around the same.

8.     As a direct and proximate result of one or more of the foregoing acts or omissions on the part of Safety-Kleen, Plaintiff was exposed to and inhaled, ingested or otherwise absorbed VOCs in sufficient amount to cause CLL.

9.     As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, Plaintiff developed CLL.

10.     As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Safety-Kleen Systems, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

**COUNT 4**
**SAFETY-KLEEN SYSTEMS, INC.**
**(Strict Liability)**

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all times herein set forth, Safety-Kleen manufactured, sold, distributed, or supplied materials, products and/or equipment containing and emitting VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by Safety-Kleen. These materials, products, and/or equipment included, but are not limited to, the sale, manufacture, distribution, and/or supply of: thinners, mineral spirits, solvents, degreasers, parts cleaners, parts and/or tool washing solvents, and/or parts and/or tool washing equipment.

3.     Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials/equipment were completely foreseeable and could or should have been anticipated by Safety-Kleen.

4.     Said materials/products/equipment were in a defective and unreasonably dangerous condition at the time they left the control of Safety-Kleen in that:

      a) they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were not accompanied by any, or adequate, warnings or instructions regarding the hazards associated with the regular, expected and intended use of said materials/products and/or any such warning or instructions were not adequate; and/or,

      b) they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were more dangerous than an ordinary consumer would anticipate.

5.     The Safety-Kleen parts cleaning machine was defectively designed in that it did not incorporate appropriate engineering controls to exhaust the VOCs away from workers, like Plaintiff.

6.     Said materials/products/equipment reached the end-users and the point of exposure in substantially the same condition as when they left the control of Safety-Kleen.

7.     At all relevant times, said materials/products were used by Plaintiff in the manners and environments anticipated, expected, and intended by Safety-Kleen, and which were reasonably foreseeable to Safety-Kleen.

8.     As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Safety-Kleen Systems, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 5
## SHELL USA, INC.
### (VOC-Product Defendant: Negligence)

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      At all times herein set forth, Defendant, Shell USA, Inc. ("Shell"), manufactured, sold, distributed, or supplied materials/products containing VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by Shell. These materials and/or products included, but are not limited to, the sale, manufacture, distribution, and/or supply of: fuels, fuel additives, penetrating oils, greases, solvents, cleaners, starting fluids, mastics, epoxies, and raffinate.

3.      Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by Shell.

4.      Shell knew or should have known the VOC's contained in their materials/products were hazardous and had a toxic, poisonous, and highly deleterious effect upon the health of persons, including Plaintiff, inhaling, ingesting, absorbing through the skin or otherwise absorbing them.

5.      Shell withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation, and foreseeability that Plaintiff, his employers, and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its carcinogen-containing products.

6.     By 1950, C.H. Hine, M.D., a consulting toxicologist reported in an internal Shell memorandum that benzene was one of the few compounds with established carcinogenic qualities that the origin of environmental cancer can be traced to. Shell did not disclose the benzene content of its products identified in this Complaint.

7.     Despite its knowledge of benzene causing cancer, Shell did not disclose its knowledge and information that benzene causes cancer. Rather, Shell made affirmative statements about the health hazards of benzene and its ability to cause cancer that were not accurate, and which led the user to believe that its products were safer than they actually were.

8.     Plaintiff was unaware of the hazards of exposure to VOCs, specifically the effects of long-term exposure.

9.     At all times herein relevant, Shell had a duty to exercise reasonable care and caution for the safety of Plaintiff and others who worked with and/or around said materials/products.

10.     Shell failed to exercise ordinary care and caution for the safety of Plaintiff in one or more of the following respects:

a) Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, even though it was completely foreseeable and could or should have been anticipated that persons, such as Plaintiff, working with or around them would inhale, ingest or otherwise absorb VOCs;

b) Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, when this Defendant knew or should have known that the same would have a toxic, poisonous and highly deleterious effect upon the health of persons, such as Plaintiff, inhaling, ingesting or otherwise absorbing it;

c) Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of the same, when adequate substitutes were available;

d) Failed to provide any or adequate warnings to persons, such as Plaintiff, working with and around their VOC containing products/materials of the dangers of inhaling, ingesting or otherwise absorbing the same;

e) Failed to provide any or adequate instructions concerning safe and/or safer methods of working with and around VOCs, and VOC-containing

materials/products to Plaintiff and others similarly situated, including specific instructions on how to avoid inhaling, ingesting, or otherwise absorbing the same; and/or,

f) Failed to conduct tests on their respective materials /products containing VOCs to determine the hazards to which persons, such as Plaintiff, who might be exposed while working with and around the same.

11. As a direct and proximate result of one or more of the foregoing acts or omissions on the part of Shell, Plaintiff was exposed to and inhaled, ingested, or otherwise absorbed VOCs in sufficient amount to cause CLL.

12. As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, Plaintiff developed CLL.

13. As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Shell USA, Inc., jointly and severally, to award compensatory damages in excess of the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 6
## SHELL USA, INC.
### (Strict Liability)

1. Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2. At all times herein set forth, Shell manufactured, sold, distributed, or supplied materials/products containing VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they

were intended by Shell. These materials and/or products included, but are not limited to, the sale, manufacture, distribution, and/or supply of: fuels, fuel additives, penetrating oils, greases, solvents, cleaners, starting fluids, mastics, epoxies, and raffinate.

3. Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by Shell.

4. Said materials/products were in a defective and unreasonably dangerous condition at the time they left the control of Shell in that:

    a) they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were not accompanied by any, or adequate, warnings or instructions regarding the hazards associated with the regular, expected and intended use of said materials/products and/or any such warning or instructions were not adequate; and/or,

    b) they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were more dangerous than an ordinary consumer would anticipate.

5. Said materials/products reached the end-users and the point of exposure in substantially the same condition as when they left the control of Shell.

6. Shell withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation, and foreseeability that Plaintiff, his employers, and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its carcinogen-containing products.

7. At all relevant times, said materials/products were used by Plaintiff in the manners and environments anticipated, expected, and intended by Shell, and which were reasonably foreseeable to Shell.

8.     As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Shell USA, Inc., jointly and severally, to award compensatory damages in excess of the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

### COUNT 7
### MONSANTO COMPANY
### (Strict Liability: Design Defect)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     Plaintiff developed CLL, which caused him pain, suffering, disability, disfigurement, and loss of normal life as a result of using Monsanto's Roundup® products.

3.     At all relevant times, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

4.     At all times relevant to this litigation, Monsanto designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed its Roundup® products used by Plaintiff, and/or to which the Plaintiff was exposed, as described above.

5.     At all times relevant, Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and Plaintiff in particular.

6.     At all times relevant, Monsanto's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

7.     Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto, were defectively manufactured, and designed by Monsanto in that when they left the hands of Monsanto, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

8.     Therefore, at all relevant times to this litigation, Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto, were defective in design and formulation, in one or more of the following ways:

> a)  When placed in the stream of commerce, Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.
> b)  When placed in the stream of commerce, Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.
> c)  When placed in the stream of commerce, Monsanto's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

9.     At all times relevant to this litigation, Plaintiff used and/or was exposed to Monsanto's Roundup® products in an intended or reasonably foreseeable manner.

10.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

11.     <u>Monsanto's defective design of its Roundup® products amounts to willful, wanton, and/or reckless conduct by Monsanto.</u>

12.     As a direct and proximate result of the defective design and manufacture of its Roundup® products, Plaintiff developed CLL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages now and in the future.

13.     Therefore, as a result of the unreasonably dangerous condition of the Roundup® products, Monsanto is strictly liable to Plaintiff.

14.     As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering and has suffered economic losses now and, in the future, (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Monsanto Company, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

### COUNT 8
### MONSANTO COMPANY
### (Strict Liability: Failure to Warn)

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      At all relevant times, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

3.      Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, Plaintiffs employers, Plaintiffs co-workers, and persons responsible for consumers (such as employers), and Monsanto therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of its Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

4.      At all times relevant, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Monsanto, as manufacturers, sellers, or distributors of chemical herbicides, is held to the knowledge of an expert in the field.

5.      At the time of manufacture, Monsanto could have provided warnings or instructions regarding the full and complete risks of its Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

6.      At all times-relevant, Monsanto failed to investigate, study, test, or promote the safety of its various Roundup® products. Monsanto also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by its herbicides, including Plaintiff.

7.      Even though Monsanto knew or should have known that its Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff and his employers.

8.      Monsanto knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Monsanto has wrongfully concealed information concerning the dangerous nature of its Roundup® products and its active ingredient – glyphosate - and further made false and/or misleading statements concerning the safety of its Roundup® products and glyphosate.

9.      At all times relevant, Monsanto's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products

throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

10.     At all times relevant, Plaintiff used and/or was exposed to the use of Monsanto's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

11.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of his exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

12.     Monsanto knew or should have known that the minimal warnings, if any, disseminated with Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the product safe for its ordinary, intended, and reasonably foreseeable for agricultural, horticultural, and/or residential applications.

13.     Monsanto's actions and inactions described above were performed willfully, intentionally and/or with reckless disregard for the rights and safety of Plaintiff.

14.     The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers, herbicide applicators, and/or at-home users such as Plaintiff to utilize the products safely and with adequate protection.

15.     Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to its Roundup® products and glyphosate; in fact, Monsanto continued to aggressively promote the efficacy of the

Roundup® products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to its Roundup® products and glyphosate.

16.     To this day, Monsanto has still failed to adequately and accurately warn of the true risks of cancer associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

17.     To this day, and upon information and belief, Monsanto has still failed to test, investigate, or study formulated Roundup® products.

18.     As a result of their inadequate warnings, Monsanto's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto for distribution and use by Plaintiff.

19.     Monsanto is strictly liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other relevant information and data regarding the appropriate use of their Roundup® products and the risks associated with the use of or exposure to Roundups and glyphosate.

20.     The defects in Monsanto's Roundup® products were substantial and contributing factors in causing and/or contributing to Plaintiff's injuries.

21.     Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

22.     As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the

hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering and has suffered economic losses now and, in the future, (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Monsanto Company, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

<u>**COUNT 9**</u>
<u>**MONSANTO COMPANY**</u>
<u>**(Negligence)**</u>

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      At all relevant times, Monsanto breached its duties to Plaintiff and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup® products.

3.      Monsanto, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiff.

4.      At all times relevant, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

5.	At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products.

6.	Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® products and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® products and, in particular, its active ingredient glyphosate.

7.	At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of its Roundup® products and specifically, the carcinogenic properties of the chemical glyphosate.

8.	Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

9.	Monsanto knew or, in the exercise of reasonable care, should have known that its Roundup® products were more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from its Roundup® products.

10.	Monsanto knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient – glyphosate - were insufficient to prove the safety of Roundup®.

11.	Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of its Roundup® products were unaware of the risks and the magnitude of

the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

12.     As such, Monsanto breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their Roundup® products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

13.     Monsanto failed to appropriately and adequately test its Roundup® products, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

14.     Despite Monsanto's ability and means to investigate, study, and test the products and to provide adequate warnings, Monsanto still failed to do so and thereby wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

15.     Monsanto's negligence included:

    a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

    b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

Page 25 of 81

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d) Failing to test, investigate, or study the formulated Roundup® products;

e) Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether "inert" ingredients and/or adjuvants were safe for use;

f) Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

g) Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

h) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and/or be exposed to Roundup® products;

i) Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

j) Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

k) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects and carcinogenicity of Roundup® and glyphosate-containing products;

l) Representing that Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended use;

m) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

n) Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

o) Continuing to disseminate information to their consumers, which indicate or imply that Monsanto's Roundup® products are safe for use in the agricultural, horticultural industries, and/or home use; and

p) Continuing the manufacture and sale of the products with the knowledge that the products were unreasonably unsafe and dangerous.

16.     Monsanto knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of its Roundup® products.

17.     <u>Monsanto's actions and inactions described above were performed willfully, intentionally and/or with reckless disregard for the rights and safety of Plaintiff</u>.

18.     Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

19.     Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

20.     Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of their products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff.

21.     As a proximate result of Monsanto's wrongful acts and omissions sated herein, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering and has suffered economic losses now and, in the future, (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Monsanto Company, jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## <u>COUNT 10</u>

## MONSANTO COMPANY
## (VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all relevant times, Monsanto engaged in consumer-oriented, consumer commerce and trade, including advertising, offering for sale, sale, or distribution of tangible or personal property by selling, distributing and/or advertising a glyphosate-containing product.

3.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (the "Consumer Fraud Act"), was enacted to protect consumers from unfair or deceptive acts and practices.

4.     At all relevant times, Monsanto's sale of Roundup® products and conduct in connection with its sales was impermissible and illegal in violation of the Consumer Fraud Act in that Monsanto engaged in unfair or deceptive acts or practices by engaging in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding, because Monsanto misleadingly, falsely, unconscionably and/or deceptively misrepresented and/or omitted material facts regarding, among other things, the safety of its glyphosate-containing product by failing to disclose the risk of cancer from using the products in a manner foreseeable and/or intended. Monsanto's conduct violated the Consumer Fraud Act and caused Plaintiff an ascertainable loss.

5.     Monsanto was in the possession of evidence demonstrating that its Roundup® products caused and/or has the potential to cause cancer. Nevertheless, Monsanto continued to market, sell, and distribute its Roundup® products without disclosing the above information regarding its product.

6.    Plaintiff saw and relied upon the packaging of Monsanto's Roundup® products that he purchased, which did not state, although it could have, that Roundup® products contained a cancer-causing toxic substance that could cause injuries such as CLL.

7.    Monsanto intended Plaintiff rely on such conduct and or omissions before purchasing and using Roundup®.

8.    Monsanto's said deception and omissions relating to the production, marketing, sale, and/or distribution of Roundup® occurred in the course of conduct involving a trade or commerce.

9.    As a result, Plaintiff continued to purchase and use Roundup® and suffered ascertainable losses because of such purchases and uses.

10.    If Plaintiff had known that Monsanto's Roundup® products that he had purchased contained or had a material risk of containing a cancer-causing toxic substance, Plaintiff would not have purchased it or would not have paid as much for it.

11.    Monsanto's actions and inactions described above were performed willfully, intentionally, and/or with reckless disregard for the rights and safety of Plaintiff and the public, entitling Plaintiff to actual and treble damages.

12.    As a direct and proximate result of Monsanto's unlawful trade practices, Plaintiff did not receive the benefit of the bargain, developed CLL, and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, emotional distress, and economic damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant, Monsanto Company, for compensatory damages in an amount in excess of $50,000, including any and all available damages and fees under the Illinois Consumer Fraud and Deceptive

Business Practices Act, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

### COUNT 11
### MONSANTO COMPANY
### (BREACH OF CONTRACT: EXPRESS WARRANTIES)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all relevant times, Monsanto engaged in the business of testing, inspecting, marketing, selling, distributing and/or promoting Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the control and supervision of Monsanto.

3.     Before the time that Plaintiff purchased and was exposed to the use of Roundup® products, Monsanto expressly warranted to its consumers and users - including Plaintiff - that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

4.     Monsanto, however, failed to disclose that its Roundup® products had dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

5.     The representations, as set forth above, contained, or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

6.     Roundup® did not conform to the representations made by Monsanto as Roundup® was not safe for use by individuals such as Plaintiff.

7.     At all times relevant, Plaintiff purchased, used, and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

8.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate.

9.     The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries and damages. As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce and failing to warn Plaintiff of the increased risk of CLL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiff has developed CLL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, emotional distress, and economic damages, including for medical care and treatment.

10.     The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

11.     As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, emotional distress, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Monsanto Company, jointly and severally, to award compensatory

damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 12
## MONSANTO COMPANY
## (BREACH OF CONTRACT: IMPLIED WARRANTIES)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all relevant times, Monsanto engaged in the business of testing, inspecting, selling, distributing, and/or promoting Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the control and supervision of Monsanto.

3.     Before the time Plaintiff was exposed to the use of the aforementioned Roundup® products, Monsanto impliedly warranted to its consumers and users - including Plaintiff - that their Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as herbicides and weed killers.

4.     Defendants, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

5.     Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants and upon their implied warranties that the Roundup® products were of merchantable quality and fit for its intended purpose or use.

6.     The Roundup® products were expected to reach and did in fact reach consumers, users, and those in proximity to users, including Plaintiff, without substantial change in the

condition in which they were manufactured, distributed, marketed, packaged, and sold by Monsanto.

7.     At all relevant times, Monsanto was aware that consumers, users, and those in proximity of users of its products, including Plaintiff, would use Roundup® products as marketed by Defendants, thus Plaintiff was the foreseeable user of Roundup®.

8.     Monsanto intended for its Roundup® products be used in the manner in which Plaintiff in fact used or was exposed to them and impliedly warranted each product to be of merchantable quality, safe and fit for this use, despite the fact that Roundup® was not adequately tested or researched-and is in fact carcinogenic.

9.     In reliance upon Monsanto's implied warranty, Plaintiff purchased, used, or was in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and/or marketed by Monsanto.

10.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate.

11.     Monsanto breached its implied warranty to Plaintiff because the Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

12.     The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

13.     As a direct and proximate result of Monsanto's wrongful acts and omissions Plaintiff purchased the Roundup® products and has suffered severe and permanent physical and

emotional injuries. Plaintiff has endured pain and suffering, emotional distress, and has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Monsanto Company, jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

**COUNT 13**
**LOWES HOME CENTERS, LLC**
**(NEGLIGENCE)**

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      Lowes Home Centers, LLC ("Lowes") promoted, marketed, distributed, and sold Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

3.      At all times relevant herein, the Roundup® products promoted, marketed, distributed, and sold to the Plaintiff by Lowes were defective.

4.      At some point in time before Plaintiff purchased Roundup® products from Lowes, Lowes knew or should have known that Roundup® products were defective and unsafe for use

5.      Nevertheless, Lowes continued to sell and/or fail to separately warn Plaintiff that the Roundup® products Lowes sold to him were dangerous even though it was aware of such information and could have separately warned and/or sold and promoted safer alternatives and/or discontinued its sale of Roundup® products.

6.      Lowes owed a duty to the Plaintiff to exercise ordinary care in the promotion, marketing, distribution, warning, and sale of the Roundup® products it sold to the Plaintiff.

7.     Lowes breached the aforesaid duty and was negligent through one or more of the

following acts and or omissions that was a proximate cause of damages to the Plaintiff:

a) Failed to separately warn consumers that Roundup® products were unsafe even though it knew or should have known it was unsafe;

b) Failed to assure Roundup® products were non-carcinogenic when it knew or should have known that the Roundup® products were carcinogenic;

c) Marketed Roundup® products in a way that implied they were safe when they were not, and it knew or should have known were not safe;

d) Sold Roundup® products that were defective and knew or should have known were defective;

e) Sold Roundup® products that caused injury and knew or should have known would cause injury;

f) Sold Roundup® products that it knew or should have reasonably known were unsafe;

g) Continued to distribute, sell, and promote Roundup® products that were unsafe after it knew or should have known were unsafe;

h) Continued to distribute, sell, and promote Roundup® products that were unsafe after it knew or should have known were unsafe and knew or should have known other safer alternatives were available;

i) Failed to test Roundup® products it sold after it knew or should have known the products were probably carcinogenic;

j) Failed to test or adequately investigate Roundup® products it sold after it knew or should have known the products were probably carcinogenic, especially after it received the Material Safety Data Sheet for Roundup®, which indicated that Roundup® was probably carcinogenic by an independent group and only refuted by the manufacturer, an interested and conflicted party;

k) Failed to consult with its own experts and/or independent experts as to whether Roundup® may be carcinogenic, especially after it received Roundup®'s Material Safety Data Sheet;

l) Ignored the content and/or conflict within Roundup®'s Material Safety Data Sheet regarding whether Roundup® is carcinogenic;

m) Failed to make Roundup®'s Material Safety Data Sheet, which indicated that Roundup® was probably carcinogenic, readily available to consumers in its stores; and/or,

n) Failed to warn consumers that Roundup®'s Material Safety Data Sheet indicated that Roundup® was probably carcinogenic and/or allow consumers to make an informed decision before purchasing the products in store.

8.     As a proximate result of Lowes's wrongful acts and omissions stated herein,

Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured

pain and suffering and has suffered economic losses now and, in the future, (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Lowes Home Centers, LLC, jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

### COUNT 14
### LOWES HOME CENTERS, LLC
### (VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT)

1.  Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.  At all relevant times herein, Lowes engaged in consumer-oriented, consumer commerce and trade, including advertising, offering for sale, sale, or distribution of tangible or personal property by selling, distributing and/or advertising Roundup® products.

3.  Lowes promoted, marketed, distributed, and sold Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

4.  At all times relevant herein, the Roundup® products promoted, marketed, distributed, and sold to the Plaintiff by Lowes were defective.

5.  At some point in time before Plaintiff purchased Roundup from Lowes, Lowes knew or should have known that Roundup® products were defective and unsafe for use.

6.  Nevertheless, Lowes continued to sell and/or fail to separately warn Plaintiff that the Roundup products Lowes sold to him were dangerous even though it was aware of such information and could have separately warned and/or sold safer alternatives and/or discontinued its sale of Roundup products.

7.    If Lowes had separately warned Plaintiff that the Roundup products purchased from Lowes contained, or had a material risk of containing, a cancer-causing toxic substance, Plaintiff would not have purchased it and/or would have bought safer alternatives available at Lowes.

8.    Further, if Lowes had discontinued the sale, promotion, and/or advertising of Roundup products after it became aware it contained, or had a material risk of containing, a cancer-causing toxic substance, Plaintiff would not have purchased it and/or would have purchased safer alternatives available at Lowes.

9.    Lowes intended Plaintiff rely on such conduct and or omissions before purchasing and using Roundup®.

10.   Lowes's said deception and omissions relating to the marketing, sale, and/or distribution of Roundup® occurred in the course of conduct involving a trade or commerce.

11.   As a result, Plaintiff continued to purchase and use Roundup products from Lowes and suffered ascertainable losses while Lowes continued to make a profit from its sale of Roundup products.

12.   As a direct and proximate result of Lowes's unlawful trade practices, Plaintiff purchased Roundup products from Lowes that he then used, which caused or contributed to him developing CLL and causing him severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, emotional distress, and economic damages now and in the future.

13.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (the "Consumer Fraud Act"), was enacted to protect consumers from unfair or deceptive acts and practices.

14.     Lowes's actions and inactions described above were performed willfully, intentionally, and/or with reckless disregard for the rights and safety of Plaintiff and the public and were in violation of the Consumer Fraud Act thus entitling Plaintiff to actual and treble damages, and attorney fees.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant, Lowes Home Centers, LLC, for compensatory damages in an amount in excess of $50,000, including any and all available damages and fees under the Illinois Consumer Fraud and Deceptive Business Practices Act, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

### COUNT 15
### LOWES HOME CENTERS, LLC
### (BREACH OF CONTRACT: EXPRESS WARRANTIES)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all relevant times, Lowes engaged in the business of inspecting, marketing, selling, distributing and/or promoting Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of coCLLerce. These actions were known or should have been known to Lowes, and under the control and supervision of Lowes.

3.     Before the time that Plaintiff purchased Roundup® products from Lowes and was subsequently exposed to the use of such products, Lowes expressly warranted to its consumers, including Plaintiff, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

4.     Lowes, however, failed to separately warn and/or disclose, though it knew or should have known, that Roundup® products had dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

5.     The representations, as set forth above, contained, or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

6.     The Roundup® products Lowes sold did not conform to the representations made by Lowes as the Roundup® products it sold were not safe for use by individuals such as Plaintiff and Lowes knew or should have known such.

7.     At all times relevant, Plaintiff purchased, used, and/or was exposed to the use of Roundup® products bought from Lowes in its intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

8.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate sold by or purchased from Lowes.

9.     The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries and damages. As a direct and proximate result of Lowes continuing to sell defective Roundup® products into the stream of commerce and failing to warn Plaintiff of the increased risk of cancer associated with the use of and/or exposure to Roundup® products as described herein, though Lowes knew or should have known of such, Plaintiff has developed CLL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability,

impairment, loss of enjoyment of life, loss of care and comfort, emotional distress, and economic damages now and in the future, including for medical care and treatment.

10.     The harm caused by Roundup® products purchased from Lowes and Lowes's decision to continue selling Roundup® products at all or without any separate adequate warning after it knew or should have known it was unsafe, and had other safer alternatives available, far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

11.     As a direct and proximate result of Lowes's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, emotional distress, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Lowes Home Centers, LLC, jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 16
## LOWES HOME CENTERS, LLC
## (BREACH OF CONTRACT: IMPLIED WARRANTIES)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all relevant times, Lowes engaged in the business of inspecting, marketing, selling, distributing and/or promoting Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing

Roundup® products into the stream of commerce. These actions were known or should have been known to Lowes, and under the control and supervision of Lowes.

3.     Before the time that Plaintiff purchased Roundup® products from Lowes and was subsequently exposed to the use of such products, Lowes impliedly warranted to its consumers, including Plaintiff, that the Roundup® products it sold were of merchantable quality and safe and fit for the use for which they were intended; specifically, as herbicides and weed killers.

4.     Lowes, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

5.     Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Lowes and upon their implied warranties that the Roundup® products Lowes sold were of merchantable quality and fit for its intended purpose or use.

6.     The Roundup® products sold by Lowes were expected to reach and did in fact reach consumers, users, and those in close proximity to users, including Plaintiff, without substantial change in the condition in which they were manufactured, distributed, marketed, packaged, and sold by Lowes.

7.     At all relevant times, Lowes was aware that consumers, users, and those in proximity to users of the Roundup® products it sold, including Plaintiff, would use the Roundup® products as marketed, thus Plaintiff was a foreseeable user of Roundup®.

8.     Lowes intended for the Roundup® products it sold be used in the manner in which Plaintiff in fact used or was exposed to them and impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Lowes knew or should have known Roundup® was in fact carcinogenic.

9.      In reliance upon Lowes's implied warranty, Plaintiff purchased, used, or was in proximity to the use of Roundup® products from Lowes as instructed and labeled and in the foreseeable manner intended, recommended, promoted and/or marketed by Lowes and the Roundup® products itself.

10.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate sold by or purchased from Lowes.

11.     Lowes breached its implied warranty to Plaintiff because the Roundup® products it sold were not of merchantable quality, safe, or fit for its intended use, or adequately tested or warned of, though Lowes knew or should have known Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

12.     The harm caused by Roundup® products purchased from Lowes and Lowes's decision to continue selling Roundup® products at all or without any separate and adequate warning after it knew or should have known it was unsafe, and had other safer alternatives available, far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

13.     As a direct and proximate result of Lowes's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, emotional distress, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Lowes Home Centers, LLC, jointly and severally, to award compensatory

damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

### COUNT 17
### MENARD, INC.
### (NEGLIGENCE)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     Menard promoted, marketed, distributed, and sold Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

3.     At all times relevant herein, the Roundup® products promoted, marketed, distributed, and sold to the Plaintiff by Menard were defective.

4.     At some point in time before Plaintiff purchased Roundup® products from Menard, Menard knew or should have known that Roundup® products were defective and unsafe for use

5.     Nevertheless, Menard continued to sell and/or fail to separately warn Plaintiff that the Roundup® products Menard sold to him were dangerous even though it was aware of such information and could have separately warned and/or sold and promoted safer alternatives and/or discontinued its sale of Roundup® products.

6.     Menard owed a duty to the Plaintiff to exercise ordinary care in the promotion, marketing, distribution, warning, and sale of the Roundup® products it sold to the Plaintiff.

7.     Menard breached the aforesaid duty and was negligent through one or more of the following acts and or omissions that was a proximate cause of damages to the Plaintiff:

   a) Failed to separately warn consumers that Roundup® products were unsafe even though it knew or should have known it was unsafe;
   b) Failed to assure Roundup® products were non-carcinogenic when it knew or should have known that the Roundup® products were carcinogenic;

c) Marketed Roundup® products in a way that implied they were safe when they were not, and it knew or should have known were not safe;

d) Sold Roundup® products that were defective and knew or should have known were defective;

e) Sold Roundup® products that caused injury and knew or should have known would cause injury;

f) Sold Roundup® products that it knew or should have reasonably known were unsafe;

g) Continued to distribute, sell, and promote Roundup® products that were unsafe after it knew or should have known were unsafe;

h) Continued to distribute, sell, and promote Roundup® products that were unsafe after it knew or should have known were unsafe and knew or should have known other safer alternatives were available;

i) Failed to test Roundup® products it sold after it knew or should have known the products were probably carcinogenic;

j) Failed to test or adequately investigate Roundup® products it sold after it knew or should have known the products were probably carcinogenic, especially after it received the Material Safety Data Sheet for Roundup®, which indicated that Roundup® was probably carcinogenic by an independent group and only refuted by the manufacturer, an interested and conflicted party;

k) Failed to consult with its own experts and/or independent experts as to whether Roundup® may be carcinogenic, especially after it received Roundup®'s Material Safety Data Sheet;

l) Ignored the content and/or conflict within Roundup®'s Material Safety Data Sheet regarding whether Roundup® is carcinogenic;

m) Failed to make Roundup®'s Material Safety Data Sheet, which indicated that Roundup® was probably carcinogenic, readily available to consumers in its stores; and/or,

n) Failed to warn consumers that Roundup®'s Material Safety Data Sheet indicated that Roundup® was probably carcinogenic and/or allow consumers to make an informed decision before purchasing the products in store.

8. As a proximate result of Menard's wrongful acts and omissions sated herein, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering and has suffered economic losses now and, in the future, (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Menard, Inc., jointly and severally, to award compensatory damages more

than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 18
## MENARD, INC.
## (VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT)

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      At all relevant times herein, Menard engaged in consumer-oriented, consumer coCLLerce and trade, including advertising, offering for sale, sale, or distribution of tangible or personal property by selling, distributing and/or advertising Roundup® products.

3.      Menard promoted, marketed, distributed, and sold Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

4.      At all times relevant herein, the Roundup® products promoted, marketed, distributed, and sold to the Plaintiff by Menard were defective.

5.      At some point in time before Plaintiff purchased Roundup from Menard, Menard knew or should have known that Roundup® products were defective and unsafe for use.

6.      Nevertheless, Menard continued to sell and/or fail to separately warn Plaintiff that the Roundup products Menard sold to him were dangerous even though it was aware of such information and could have separately warned and/or sold safer alternatives and/or discontinued its sale of Roundup products.

7.      If Menard had separately warned Plaintiff that the Roundup products purchased from Menard contained, or had a material risk of containing, a cancer-causing toxic substance, Plaintiff would not have purchased it and/or would have bought safer alternatives available at Menard.

8.     Further, if Menard had discontinued the sale, promotion, and/or advertising of Roundup products after it became aware it contained, or had a material risk of containing, a cancer-causing toxic substance, Plaintiff would not have purchased it and/or would have purchased safer alternatives available at Menard.

9.     Menard intended Plaintiff rely on such conduct and or omissions before purchasing and using Roundup®.

10.     Menard's said deception and omissions relating to the marketing, sale, and/or distribution of Roundup® occurred in the course of conduct involving a trade or commerce.

11.     As a result, Plaintiff continued to purchase and use Roundup products from Menard and suffered ascertainable losses while Menard continued to make a profit from its sale of Roundup products.

12.     As a direct and proximate result of Menard unlawful trade practices, Plaintiff purchased Roundup products from Menard that he then used, which caused or contributed to him developing CLL and causing him severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, emotional distress, and economic damages now and in the future.

13.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (the "Consumer Fraud Act"), was enacted to protect consumers from unfair or deceptive acts and practices.

14.     Menard's actions and inactions described above were performed willfully, intentionally, and/or with reckless disregard for the rights and safety of Plaintiff and the public and were in violation of the Consumer Fraud Act thus entitling Plaintiff to actual and treble damages, and attorney fees.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant, Menard, Inc., for compensatory damages in an amount in excess of $50,000, including any and all available damages and fees under the Illinois Consumer Fraud and Deceptive Business Practices Act, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

**COUNT 19**
**MENARD, INC.**
**(BREACH OF CONTRACT: EXPRESS WARRANTIES)**

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      At all relevant times, Menard engaged in the business of inspecting, marketing, selling, distributing and/or promoting Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were known or should have been known to Menard, and under the control and supervision of Menard.

3.      Before the time that Plaintiff purchased Roundup® products from Menard and was subsequently exposed to the use of such products, Menard expressly warranted to its consumers, including Plaintiff, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

4.      Menard, however, failed to separately warn and/or disclose, though it knew or should have known, that Roundup® products had dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

5.     The representations, as set forth above, contained, or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

6.     The Roundup® products Menard sold did not conform to the representations made by Menard as the Roundup® products it sold were not safe for use by individuals such as Plaintiff and Menard knew or should have known such.

7.     At all times relevant, Plaintiff purchased, used, and/or was exposed to the use of Roundup® products bought from Menard in its intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

8.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate sold by or purchased from Menard.

9.     The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries and damages. As a direct and proximate result of Menard continuing to sell defective Roundup® products into the stream of commerce and failing to separately and adequately warn Plaintiff of the increased risk of cancer associated with the use of and/or exposure to Roundup® products bought from Menard as described herein, though Menard knew or should have known of such, Plaintiff has developed CLL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, emotional distress, and economic damages now and in the future, including for medical care and treatment.

10.     The harm caused by Roundup® products purchased from Menard and Menard's decision to continue selling Roundup® products at all or without any separate adequate warning

after it knew or should have known it was unsafe, and had other safer alternatives available, far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

11.     As a direct and proximate result of Menard's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, emotional distress, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Menard, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

### COUNT 20
### MENARD, INC.
### (BREACH OF CONTRACT: IMPLIED WARRANTIES)

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      At all relevant times, Menard engaged in the business of inspecting, marketing, selling, distributing and/or promoting Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were known or should have been known to Menard, and under the control and supervision of Menard.

3.      Before the time that Plaintiff purchased Roundup® products from Menard and was subsequently exposed to the use of such products, Menard impliedly warranted to its consumers,

including Plaintiff, that the Roundup® products it sold were of merchantable quality and safe and fit for the use for which they were intended; specifically, as herbicides and weed killers.

4. Menard, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

5. Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Menard and upon their implied warranties that the Roundup® products Menard sold were of merchantable quality and fit for its intended purpose or use.

6. The Roundup® products sold by Menard were expected to reach and did in fact reach consumers, users, and those in close proximity to users, including Plaintiff, without substantial change in the condition in which they were manufactured, distributed, marketed, packaged, and sold by Menard.

7. At all relevant times, Menard was aware that consumers, users, and those in proximity to users of the Roundup® products it sold, including Plaintiff, would use the Roundup® products as marketed, thus Plaintiff was a foreseeable user of Roundup®.

8. Menard intended for the Roundup® products it sold be used in the manner in which Plaintiff in fact used or was exposed to them and impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Menard knew or should have known Roundup® was in fact carcinogenic.

9. In reliance upon Menard implied warranty, Plaintiff purchased, used, or was in proximity to the use of Roundup® products from Menard as instructed and labeled and in the foreseeable manner intended, recommended, promoted and/or marketed by Menard and the Roundup® products itself.

10.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate sold by or purchased from Menard.

11.     Menard breached its implied warranty to Plaintiff because the Roundup® products it sold were not of merchantable quality, safe, or fit for its intended use, or adequately tested or warned of, though Menard knew or should have known Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

12.     The harm caused by Roundup® products purchased from Menard and Menard's decision to continue selling Roundup® products at all or without any separate and adequate warning after it knew or should have known it was unsafe, and had other safer alternatives available, far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

13.     As a direct and proximate result of Menard's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, emotional distress, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Menard, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

**COUNT 21**
**HOME DEPOT U.S.A., INC.**
**(NEGLIGENCE)**

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      Home Depot promoted, marketed, distributed, and sold Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

3.      At all times relevant herein, the Roundup® products promoted, marketed, distributed, and sold to the Plaintiff by Home Depot were defective.

4.      At some point in time before Plaintiff purchased Roundup® products from Home Depot, Home Depot knew or should have known that Roundup® products were defective and unsafe for use

5.      Nevertheless, Home Depot continued to sell and/or fail to separately warn Plaintiff that the Roundup® products Home Depot sold to him were dangerous even though it was aware of such information and could have separately warned and/or sold and promoted safer alternatives and/or discontinued its sale of Roundup® products.

6.      Home Depot owed a duty to the Plaintiff to exercise ordinary care in the promotion, marketing, distribution, warning, and sale of the Roundup® products it sold to the Plaintiff.

7.      Home Depot breached the aforesaid duty and was negligent through one or more of the following acts and or omissions that was a proximate cause of damages to the Plaintiff:

   a) Failed to separately warn consumers that Roundup® products were unsafe even though it knew or should have known it was unsafe;
   b) Failed to assure Roundup® products were non-carcinogenic when it knew or should have known that the Roundup® products were carcinogenic;
   c) Marketed Roundup® products in a way that implied they were safe when they were not, and it knew or should have known were not safe;
   d) Sold Roundup® products that were defective and knew or should have known were defective;
   e) Sold Roundup® products that caused injury and knew or should have known would cause injury;

f) Sold Roundup® products that it knew or should have reasonably known were unsafe;

g) Continued to distribute, sell, and promote Roundup® products that were unsafe after it knew or should have known were unsafe;

h) Continued to distribute, sell, and promote Roundup® products that were unsafe after it knew or should have known were unsafe and knew or should have known other safer alternatives were available;

i) Failed to test Roundup® products it sold after it knew or should have known the products were probably carcinogenic;

j) Failed to test or adequately investigate Roundup® products it sold after it knew or should have known the products were probably carcinogenic, especially after it received the Material Safety Data Sheet for Roundup®, which indicated that Roundup® was probably carcinogenic by an independent group and only refuted by the manufacturer, an interested and conflicted party;

k) Failed to consult with its own experts and/or independent experts as to whether Roundup® may be carcinogenic, especially after it received Roundup®'s Material Safety Data Sheet;

l) Ignored the content and/or conflict within Roundup®'s Material Safety Data Sheet regarding whether Roundup® is carcinogenic;

m) Failed to make Roundup®'s Material Safety Data Sheet, which indicated that Roundup® was probably carcinogenic, readily available to consumers in its stores; and/or,

n) Failed to warn consumers that Roundup®'s Material Safety Data Sheet indicated that Roundup® was probably carcinogenic and/or allow consumers to make an informed decision before purchasing the products in store.

8. As a proximate result of Home Depot's wrongful acts and omissions sated herein, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering and has suffered economic losses now and, in the future, (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, The Home Depot, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 22
## HOME DEPOT U.S.A., INC.

## (VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT)

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      At all relevant times herein, Home Depot engaged in consumer-oriented, consumer commerce and trade, including advertising, offering for sale, sale, or distribution of tangible or personal property by selling, distributing and/or advertising Roundup® products.

3.      Home Depot promoted, marketed, distributed, and sold Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

4.      At all times relevant herein, the Roundup® products promoted, marketed, distributed, and sold to the Plaintiff by Home Depot were defective.

5.      At some point in time before Plaintiff purchased Roundup from Home Depot, Home Depot knew or should have known that Roundup® products were defective and unsafe for use.

6.      In fact, Home Depot marketed and sold its own glyphosate-containing herbicide, HDX Weed & Grass Killer (Concentrate), which Home Depot discontinued manufacturing and selling at some point in time but did continued to market and sell Roundup®.

7.      Nevertheless, Home Depot continued to sell and/or fail to separately warn Plaintiff that the Roundup products Home Depot sold to him were dangerous even though it was aware of such information and could have separately warned and/or sold safer alternatives and/or discontinued its sale of Roundup products.

8.      If Home Depot had separately warned Plaintiff that the Roundup products purchased from Home Depot contained, or had a material risk of containing, a cancer-causing toxic

substance, Plaintiff would not have purchased it and/or would have bought safer alternatives available at Home Depot.

9.      Further, if Home Depot had discontinued the sale, promotion, and/or advertising of Roundup products after it became aware it contained, or had a material risk of containing, a cancer-causing toxic substance, Plaintiff would not have purchased it and/or would have purchased safer alternatives available at Home Depot.

10.      Home Depot intended Plaintiff rely on such conduct and or omissions before purchasing and using Roundup®.

11.      Home Depot's said deception and omissions relating to the production, marketing, sale, and/or distribution of Roundup® occurred in the course of conduct involving a trade or commerce.

12.      As a result, Plaintiff continued to purchase and use Roundup products from Home Depot and suffered ascertainable losses while Home Depot continued to make a profit from its sale of Roundup products.

13.      As a direct and proximate result of Home Depot unlawful trade practices, Plaintiff purchased Roundup products from Home Depot that he then used, which caused or contributed to him developing CLL and causing him severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, emotional distress, and economic damages now and in the future.

14.      The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (the "Consumer Fraud Act"), was enacted to protect consumers from unfair or deceptive acts and practices.

15.     Home Depot's actions and inactions described above were performed willfully, intentionally, and/or with reckless disregard for the rights and safety of Plaintiff and the public and were in violation of the Consumer Fraud Act thus entitling Plaintiff to actual and treble damages, and attorney fees.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant, The Home Depot, Inc., for compensatory damages in an amount in excess of $50,000, including any and all available damages and fees under the Illinois Consumer Fraud and Deceptive Business Practices Act, together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.

### COUNT 23
### HOME DEPOT U.S.A., INC.
### (BREACH OF CONTRACT: EXPRESS WARRANTIES)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all relevant times, Home Depot U.S.A., Inc. (herein after known as Home Depot) engaged in the business of inspecting, marketing, selling, distributing and/or promoting Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were known or should have been known to Home Depot, and under the control and supervision of Home Depot.

3.     Before the time that Plaintiff purchased Roundup® products from Home Depot and was subsequently exposed to the use of such products, Home Depot expressly warranted to its consumers, including Plaintiff, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

4.      Home Depot, however, failed to separately warn and/or disclose, though it knew or should have known, that Roundup® products had dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

5.      The representations, as set forth above, contained, or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

6.      The Roundup® products Home Depot sold did not conform to the representations made by Home Depot as the Roundup® products it sold were not safe for use by individuals such as Plaintiff and Home Depot knew or should have known such.

7.      At all times relevant, Plaintiff purchased, used, and/or was exposed to the use of Roundup® products bought from Home Depot in its intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

8.      Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate sold by or purchased from Home Depot.

9.      The breach of the warranty was a substantial factor in bringing about Plaintiff's injuries and damages. As a direct and proximate result of Home Depot continuing to sell defective Roundup® products into the stream of commerce and failing to separately and adequately warn Plaintiff of the increased risk of cancer associated with the use of and/or exposure to Roundup® products bought from Home Depot as described herein, though Home Depot knew or should have known of such, Plaintiff has developed CLL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss

of care and comfort, emotional distress, and economic damages now and in the future, including for medical care and treatment.

10.     The harm caused by Roundup® products purchased from Home Depot and Home Depot's decision to continue selling Roundup® products at all or without any separate adequate warning after it knew or should have known it was unsafe, and had other safer alternatives available, far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

11.     As a direct and proximate result of Home Depot wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, emotional distress, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, The Home Depot, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

### COUNT 24
### HOME DEPOT U.S.A., INC.
### (BREACH OF CONTRACT: IMPLIED WARRANTIES)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all relevant times, Home Depot engaged in the business of inspecting, marketing, selling, distributing and/or promoting Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiff, thereby placing

Roundup® products into the stream of commerce. These actions were known or should have been known to Home Depot, and under the control and supervision of Home Depot.

3.      Before the time that Plaintiff purchased Roundup® products from Home Depot and was subsequently exposed to the use of such products, Home Depot impliedly warranted to its consumers, including Plaintiff, that the Roundup® products it sold were of merchantable quality and safe and fit for the use for which they were intended; specifically, as herbicides and weed killers.

4.      Home Depot, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

5.      Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Home Depot and upon their implied warranties that the Roundup® products Home Depot sold were of merchantable quality and fit for its intended purpose or use.

6.      The Roundup® products sold by Home Depot were expected to reach and did in fact reach consumers, users, and those in close proximity to users, including Plaintiff, without substantial change in the condition in which they were manufactured, distributed, marketed, packaged, and sold by Home Depot.

7.      At all relevant times, Home Depot was aware that consumers, users, and those in proximity to users of the Roundup® products it sold, including Plaintiff, would use the Roundup® products as marketed, thus Plaintiff was a foreseeable user of Roundup®.

8.      Home Depot intended for the Roundup® products it sold be used in the manner in which Plaintiff in fact used or was exposed to them and impliedly warranted each product to be of

merchantable quality, safe, and fit for this use, despite the fact that Home Depot knew or should have known Roundup® was in fact carcinogenic.

9.     In reliance upon Home Depot's implied warranty, Plaintiff purchased, used, or was in proximity to the use of Roundup® products from Home Depot as instructed and labeled and in the foreseeable manner intended, recommended, promoted and/or marketed by Home Depot and the Roundup® products itself.

10.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate sold by or purchased from Home Depot.

11.     Home Depot breached its implied warranty to Plaintiff because the Roundup® products it sold were not of merchantable quality, safe, or fit for its intended use, or adequately tested or warned of, though Home Depot knew or should have known Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

12.     The harm caused by Roundup® products purchased from Home Depot and Home Depot's decision to continue selling Roundup® products at all or without any separate and adequate warning after it knew or should have known it was unsafe, and had other safer alternatives available, far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

13.     As a direct and proximate result of Home Depot's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, emotional distress, has suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, The Home Depot, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 25
## VS. DEERE & COMPANY
## (NEGLIGENCE)

1.    Plaintiff was employed by Deere & Company ("John Deere") from 1965 – 1981 in East Moline, Illinois.

2.    Daily and throughout Plaintiff's employment with John Deere, Plaintiff was regularly and routinely exposed to various toxic substances known to be cancer-causing agents and around machinery that was excessively loud.

3.    Plaintiff's last occupational exposure to the foregoing toxic substances and excessively loud noises was during 1981. Accordingly, Plaintiff would be precluded from recovery of benefits under the Illinois Workers Compensation and Occupational Disease Acts and, therefore, Plaintiff is entitled to bring this civil action pursuant to 820 ILCS 305/1.2.7 against John Deere.

4.    Plaintiff's exposure to the toxic substances and excessively loud noises was foreseeable and could or should have been anticipated by John Deere, including that Plaintiff would be exposed to such within the course of his employment by John Deere.

5.    John Deere created an unreasonable risk of harm to Plaintiff and others by using toxic substances and toxic-containing materials, products, and/or equipment and failing to provide Plaintiff with a safe workplace or to prevent harm from excessively loud noises.

6. As a result of creating such risk of harm, John Deere owed a duty to Plaintiff and others to use ordinary care in conducting any operations or activities in a manner designed to prevent or reduce exposure to toxic substances including, but not limited to, an affirmative duty to warn and/or communicate the hazards of the same.

7. John Deere had a duty to see that areas in which Plaintiff worked were reasonably safe and to protect Plaintiff from harm in conducting any operations or activities including, but not limited to, harm arising from said operations or activities but occurring away from such locations.

8. John Deere breached its duties to Plaintiff and were negligent in one or more of the following respects:

  a) Specified/required the use, application, and/or removal of toxic substances and/or toxic-containing materials, products, and/or equipment by Plaintiff and others, including coworkers of Plaintiff and other contractors, in the vicinity of Plaintiff and/or in areas in which Plaintiff worked;

  b) Required Plaintiff to perform work in the vicinity of those using, applying, and/or removing toxic substances and/or toxic-containing materials, products, and/or equipment;

  c) Purchased and/or provided toxic substances and/or toxic-containing materials, products, and/or equipment for use by its employees, including Plaintiff, and in its operations;

  d) Failed to replace toxic substances and/or toxic-containing materials and/or products with non-toxic substitutes;

  e) Failed to warn and/or coCLLunicate to Plaintiff that he was working with and/or around toxic substances and/or toxic-containing materials, products, and/or equipment and of the hazards associated therewith, including that Plaintiff was being exposed and the adverse health effects thereof;

  f) Failed to require and/or advise Plaintiff and others including Plaintiff's co-workers and other contractors to use equipment and practices designed to prevent or reduce the release, ingestion, inhalation, and/or exposure to toxic substances and/or toxic-containing materials;

  g) Failed to provide equipment and controls designed to prevent or reduce excessively loud noises, the release of toxic substances and/or toxic-containing materials and exposure to such;

  h) Failed to provide employees, including Plaintiff, with appropriate and/or adequate personal respiratory protection;

    i)   Failed to conduct medical monitoring of employees, including Plaintiff, and/or failed to advise employees, including Plaintiff, of the results of medical examinations and/or to do so completely and accurately;

    j)   Failed to require and/or advise its employees of practices designed to reduce and/or prevent carrying toxic substances and/or toxic-containing materials away from work; and/or,

    k)   Violated federal, state and/or local laws and regulations with regard to the above.

9.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions on the part of John Deere, Plaintiff was exposed to toxic substances and excessively loud noises as described above, causing Plaintiff to develop CLL and tinnitus, and thereby causing him to sustain damages.

WHEREFORE, Plaintiff, Jon R. Noland, prays judgment be entered against Defendant, Deere & Company, and for compensatory damages in excess of Fifty Thousand ($50,000.00) Dollars and for costs, pre-judgment interest, post-judgment interest, and such other and further relief as this Court deems appropriate.

## COUNT 26 – NEGLIGENCE
## (VS. R.J. REYNOLDS TOBACCO COMPANY)

1.     In 1959, Plaintiff smoked his first cigarette product that was designed, manufactured, advertised, marketed, distributed, and/or sold by R.J. Reynolds Tobacco Company ("RJR").

2.     RJR, prior to selling and/or distributing their cigarette product that Plaintiff purchased and smoked, knew that exposure, inhalation, and ingestion of cigarette smoke was harmful to human beings and that it could cause injuries, including CLL.

3.    RJR's cigarette product contained latent characteristics and/or latent functional defects at the time it was manufactured and at the time Plaintiff was exposed to them in that said product contained tar, nicotine, and other harmful substances that RJR knew or in the exercise of reasonable care, should have known would cause injuries to those who regularly used them.

4.    RJR was in the business of designing, manufacturing, advertising, marketing, distributing, and/or selling cigarette products during the times pertinent to this suit, and knew that Plaintiff and others similarly situated would encounter its cigarette products, and would be exposed to the inhalation of the smoke from said products and result in the development of life-threatening or fatal injuries including, but not limited to, CLL.

5.    RJR was negligent in the following respects:

   a) Prior to 1966, and after Plaintiff had already been exposed to and hooked on RJR's cigarette products, failing to warn of the addictive nature of its cigarette products and the adverse health effects from using such products and/or the potential to develop a habit or an addiction and suffer health effects from consistent exposure to cigarette smoke from its cigarette products as a bystander;

   b) Designing, manufacturing, developing, selling, and marketing cigarette products that were milder, had better taste, and contained nicotine so that foreseeable users, such as Plaintiff, would find smoking these its products pleasurable and in turn would lead Plaintiff, and others similarly situated, to begin smoking and/or to increase consumption;

   c) Failing to develop and utilize alternative design, manufacturing methods, and/or materials to reduce and/or eliminate harmful materials and/or characteristics from the cigarette products it designed, manufactured, advertised, marketed, distributed, and/or sold;

   d) Continuing to manufacture, distribute, and sell cigarette products when it knew at the time of said manufacture, distribution, and/or sale that such products could cause, and in fact were more likely to cause injuries, including CLL, to foreseeable users, such as Plaintiff, when used as intended;

   e) Failing to test and/or adequately test its cigarette products before offering them for sale and use by Plaintiff, and other persons similarly situated;

   f) Including nicotine, or artificially high levels of nicotine, in its cigarette products to prevent Plaintiff, and other persons similarly situated, from quitting and/or reducing consumption;

g) Utilizing tobacco and/or re-constituted tobacco that was high in nitrosamines, nitrates, nicotine, carcinogens, and other substances deleterious, poisonous, and highly harmful when alternative, less dangerous, materials were available to be used in the manufacturing process;

h) Designing and manufacturing cigarettes to be inhalable and thus unreasonably dangerous; and/or,

i) Placing additives and ingredients in its cigarettes to make them easier to inhale and unreasonably addictive.

6. RJR's cigarette products that Plaintiff was exposed to were used by Plaintiff in the manner in which they were intended or reasonably foreseeable to RJR.

7. RJR's cigarette products failed to perform as safely as Plaintiff expected it would in that they caused or contributed to him to developing CLL because of his exposure to and inhalation of cigarette smoke from RJR's cigarette products.

8. RJR's cigarette products suffered from a manufacturing and design defect in that they contained arsenic, carcinogens, toxic chemicals, toxic gases, nicotine, tars, and other substances it knew or should have known were extremely harmful in that exposure to such substances causes injuries and death, and for which there were available materials to substitute and/or manufacturing methods to reduce and/or eliminate these substances in the design and manufacture of the product.

9. As a direct and proximate result of RJR's negligent acts and/or omissions, Plaintiff developed CLL and has been compelled to expend and become liable for large sums of monies for hospital, medical, and other health care services necessary for the treatment of his cigarette induced disease and conditions now and has experienced great physical pain and mental anguish, now and in the future, as a result of the inhalation, ingestion, and absorption of RJR's cigarette products.

WHEREFORE, Plaintiff, Jon R. Noland, prays judgment be entered against Defendant, R.J. Reynolds Tobacco Company, for compensatory damages in excess of Fifty Thousand

($50,000.00) Dollars and for costs, pre-judgment interest, post-judgment interest and such other and further relief as this Court deems appropriate.

## COUNT 27 - NEGLIGENCE
## (VS. 3M COMPANY)

1.      Plaintiff has lived in Cordova, Illinois and around Defendant's, 3M Company ("3M), plant located in Cordova, Illinois.

2.      At all times relevant herein, PFAS chemicals were emitted, leaked, spilled, dumped, and otherwise discharged into the air and surface/ground/drinking water by 3M in and around where Plaintiff lived.

3.      While Plaintiff resided, stayed, spent time, and/or worked near 3M's Cordova facility, Plaintiff was exposed to and inhaled, ingested, or otherwise absorbed toxic PFAS chemicals, which was emitted, leaked, spilled, dumped, and otherwise discharged into the air and surface/ground/drinking water by 3M.

4.      3M knew or should have known that toxic PFAS chemicals had a toxic, poisonous, and highly deleterious effect upon the health of person inhaling, ingesting, or otherwise absorbing the toxic PFAS chemicals, such as Plaintiff.

5.      At all relevant times, 3M knew or should have known that:

   a.  PFAS chemicals are highly toxic;
   b.  PFAS chemicals should not be emitted, leaked, spilled, dumped, and otherwise discharged into the air and surface/ground/drinking water;
   c.  PFAS chemicals do not degrade in the environment and would enter Plaintiff's drinking water supply; and/or,
   d.  It failed to do anything substantial to stop, clean up or, in any way, remediate the release of PFAS chemicals into Plaintiff's environment or to stop the harmful effects PFAS has had on Plaintiff and/or the surrounding community.

6.      3M had actual knowledge that such conduct posed a high probability of a known health risk to the people living, such as Plaintiff, near its facility in Cordova, Illinois.

7.    At all relevant times, 3M had a duty to exercise reasonable care and caution for the safety, health, and welfare of Plaintiff and others living in close proximity its Cordova, Illinois facility where toxic PFAS chemicals were being used, processed, stored, emitted, and/or transported.

8.    3M breached its duties and failed to exercise ordinary care by emitting, leaking, spilling, dumping, and/or otherwise discharging toxic PFAS chemicals into the air and surface/ground/drinking where Plaintiff lived.

9.    As a direct and proximate result of the carelessness and negligence of 3M, Plaintiff was caused to be exposed to, inhaled, ingested, and/or otherwise absorbed toxic PFAS chemicals over a prolonged period, thereby causing, or contributing to cause, Plaintiff to develop CLL and suffer damages therefrom.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor against Defendant, 3M Company, jointly and severally, to award compensatory damages in excess of $50,000.00 and costs incurred prosecuting this matter, and to grant such other and further relief as this Court deems appropriate.

## COUNT 28
## CHEVRON U.S.A. INC.
### (VOC-Product Defendant: Negligence)

14.    Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

15.    At all times herein set forth, Defendant, CHEVRON U.S.A. INC. ("CHEVRON"), manufactured, sold, distributed, or supplied materials/products containing VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by CHEVRON. These materials

and/or products included, but are not limited to, the sale, manufacture, distribution, and/or supply of: fuels, fuel additives, penetrating oils, greases, solvents, cleaners, starting fluids, mastics, epoxies, and raffinate.

16.     Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by CHEVRON.

17.     CHEVRON knew or should have known the VOC's contained in their materials/products were hazardous and had a toxic, poisonous, and highly deleterious effect upon the health of persons, including Plaintiff, inhaling, ingesting, absorbing through the skin or otherwise absorbing them.

18.     CHEVRON withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation, and foreseeability that Plaintiff, his employers, and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its carcinogen-containing products.

19.     Despite its knowledge of benzene causing cancer, CHEVRON did not disclose its knowledge and information that benzene causes cancer. Rather, CHEVRON made affirmative statements about the health hazards of benzene and its ability to cause cancer that were not accurate, and which led the user to believe that its products were safer than they actually were.

20.     Plaintiff was unaware of the hazards of exposure to VOCs, specifically the effects of long-term exposure.

21.     At all times herein relevant, CHEVRON had a duty to exercise reasonable care and caution for the safety of Plaintiff and others who worked with and/or around said materials/products.

22.     CHEVRON failed to exercise ordinary care and caution for the safety of Plaintiff in one or more of the following respects:

      g) Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, even though it was completely foreseeable and could or should have been anticipated that persons, such as Plaintiff, working with or around them would inhale, ingest or otherwise absorb VOCs;

      h) Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, when this Defendant knew or should have known that the same would have a toxic, poisonous and highly deleterious effect upon the health of persons, such as Plaintiff, inhaling, ingesting or otherwise absorbing it;

      i) Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of the same, when adequate substitutes were available;

      j) Failed to provide any or adequate warnings to persons, such as Plaintiff, working with and around their VOC containing products/materials of the dangers of inhaling, ingesting or otherwise absorbing the same;

      k) Failed to provide any or adequate instructions concerning safe and/or safer methods of working with and around VOCs, and VOC-containing materials/products to Plaintiff and others similarly situated, including specific instructions on how to avoid inhaling, ingesting, or otherwise absorbing the same; and/or,

      l) Failed to conduct tests on their respective materials /products containing VOCs to determine the hazards to which persons, such as Plaintiff, who might be exposed while working with and around the same.

23.     As a direct and proximate result of one or more of the foregoing acts or omissions on the part of CHEVRON, Plaintiff was exposed to and inhaled, ingested, or otherwise absorbed VOCs in sufficient amount to cause CLL.

24.     As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, Plaintiff developed CLL.

25.     As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, CHEVRON U.S.A. INC., jointly and severally, to award compensatory damages in excess of the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

**COUNT 29**
**CHEVRON U.S.A. INC.**
**(Strict Liability)**

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all times herein set forth, CHEVRON manufactured, sold, distributed, or supplied materials/products containing VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by CHEVRON. These materials and/or products included, but are not limited to, the sale, manufacture, distribution, and/or supply of: fuels, fuel additives, penetrating oils, greases, solvents, cleaners, starting fluids, mastics, epoxies, and raffinate.

3.     Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by CHEVRON.

4.     Said materials/products were in a defective and unreasonably dangerous condition at the time they left the control of CHEVRON in that:

a) they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were not accompanied by any, or adequate, warnings or instructions regarding the hazards associated with the regular, expected and intended use of said materials/products and/or any such warning or instructions were not adequate; and/or,

b) they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were more dangerous than an ordinary consumer would anticipate.

5. Said materials/products reached the end-users and the point of exposure in substantially the same condition as when they left the control of CHEVRON.

6. CHEVRON withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation, and foreseeability that Plaintiff, his employers, and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its carcinogen-containing products.

7. At all relevant times, said materials/products were used by Plaintiff in the manners and environments anticipated, expected, and intended by CHEVRON, and which were reasonably foreseeable to CHEVRON.

8. As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, CHEVRON U.S.A. INC., jointly and severally, to award compensatory damages in excess of the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 30
## MARATHON PETROLEUM COMPANY
### (VOC-Product Defendant: Negligence)

1.    Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.    At all times herein set forth, Defendant, MARATHON PETROLEUM COMPANY ("Marathon"), manufactured, sold, distributed, or supplied materials/products containing VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by Marathon. These materials and/or products included, but are not limited to, the sale, manufacture, distribution, and/or supply of: fuels, fuel additives, penetrating oils, greases, solvents, cleaners, starting fluids, mastics, epoxies, and raffinate.

3.    Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by Marathon.

4.    Marathon knew or should have known the VOC's contained in their materials/products were hazardous and had a toxic, poisonous, and highly deleterious effect upon the health of persons, including Plaintiff, inhaling, ingesting, absorbing through the skin or otherwise absorbing them.

5.    Marathon withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation, and foreseeability that Plaintiff, his employers, and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its carcinogen-containing products.

6.    Despite its knowledge of benzene causing cancer, Marathon did not disclose its knowledge and information that benzene causes cancer. Rather, Marathon made affirmative statements about the health hazards of benzene and its ability to cause cancer that were not accurate, and which led the user to believe that its products were safer than they actually were.

7.    Plaintiff was unaware of the hazards of exposure to VOCs, specifically the effects of long-term exposure.

8.    At all times herein relevant, Marathon had a duty to exercise reasonable care and caution for the safety of Plaintiff and others who worked with and/or around said materials/products.

9.    Marathon failed to exercise ordinary care and caution for the safety of Plaintiff in one or more of the following respects:

  a)  Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, even though it was completely foreseeable and could or should have been anticipated that persons, such as Plaintiff, working with or around them would inhale, ingest or otherwise absorb VOCs;
  b)  Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, when this Defendant knew or should have known that the same would have a toxic, poisonous and highly deleterious effect upon the health of persons, such as Plaintiff, inhaling, ingesting or otherwise absorbing it;
  c)  Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of the same, when adequate substitutes were available;
  d)  Failed to provide any or adequate warnings to persons, such as Plaintiff, working with and around their VOC containing products/materials of the dangers of inhaling, ingesting or otherwise absorbing the same;
  e)  Failed to provide any or adequate instructions concerning safe and/or safer methods of working with and around VOCs, and VOC-containing materials/products to Plaintiff and others similarly situated, including specific instructions on how to avoid inhaling, ingesting, or otherwise absorbing the same; and/or,
  f)  Failed to conduct tests on their respective materials /products containing VOCs to determine the hazards to which persons, such as Plaintiff, who might be exposed while working with and around the same.

10.     As a direct and proximate result of one or more of the foregoing acts or omissions on the part of Marathon, Plaintiff was exposed to and inhaled, ingested, or otherwise absorbed VOCs in sufficient amount to cause CLL.

11.     As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, Plaintiff developed CLL.

12.     As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, MARATHON PETROLEUM COMPANY, jointly and severally, to award compensatory damages in excess of the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

### COUNT 31
### MARATHON PETROLEUM COMPANY
### (Strict Liability)

1.     Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.     At all times herein set forth, Marathon manufactured, sold, distributed, or supplied materials/products containing VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by Marathon. These materials and/or products included, but are not limited to, the sale, manufacture, distribution, and/or supply of: fuels, fuel additives, penetrating oils, greases, solvents, cleaners, starting fluids, mastics, epoxies, and raffinate.

3.    Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by Marathon.

4.    Said materials/products were in a defective and unreasonably dangerous condition at the time they left the control of Marathon in that:

> a)  they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were not accompanied by any, or adequate, warnings or instructions regarding the hazards associated with the regular, expected and intended use of said materials/products and/or any such warning or instructions were not adequate; and/or,
> b)  they contained and incorporated, a hazardous/carcinogenic substance, in a manner that would be inhaled, ingested, or absorbed by end-users and were more dangerous than an ordinary consumer would anticipate.

5.    Said materials/products reached the end-users and the point of exposure in substantially the same condition as when they left the control of Marathon.

6.    Marathon withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation, and foreseeability that Plaintiff, his employers, and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its carcinogen-containing products.

7.    At all relevant times, said materials/products were used by Plaintiff in the manners and environments anticipated, expected, and intended by Marathon, and which were reasonably foreseeable to Marathon.

8.    As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, MARATHON PETROLEUM COMPANY, jointly and severally, to award compensatory damages in excess of the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

## COUNT 32
## UNION CARBIDE CORPORATION
### (VOC-Product Defendant: Negligence)

1.      Plaintiff incorporates by reference the paragraphs of the General Allegations as if fully asserted herein.

2.      At all times herein set forth, Defendant, UNION CARBIDE CORPORATION ("UCC"), manufactured, sold, distributed, or supplied materials/products containing VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by UCC. These materials and/or products included, but are not limited to, the sale, manufacture, distribution, and/or supply of: fuels, fuel additives, penetrating oils, greases, solvents, cleaners, starting fluids, mastics, epoxies, and raffinate.

3.      Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by UCC.

4.      UCC knew or should have known the VOC's contained in their materials/products were hazardous and had a toxic, poisonous, and highly deleterious effect upon the health of persons, including Plaintiff, inhaling, ingesting, absorbing through the skin or otherwise absorbing them.

5.      UCC withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation, and foreseeability that Plaintiff, his employers, and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its carcinogen-containing products.

6.      Despite its knowledge of benzene causing cancer, UCC did not disclose its knowledge and information that benzene causes cancer. Rather, UCC made affirmative statements about the health hazards of benzene and its ability to cause cancer that were not accurate, and which led the user to believe that its products were safer than they actually were.

7.      Plaintiff was unaware of the hazards of exposure to VOCs, specifically the effects of long-term exposure.

8.      At all times herein relevant, UCC had a duty to exercise reasonable care and caution for the safety of Plaintiff and others who worked with and/or around said materials/products.

9.      UCC failed to exercise ordinary care and caution for the safety of Plaintiff in one or more of the following respects:

a)  Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, even though it was completely foreseeable and could or should have been anticipated that persons, such as Plaintiff, working with or around them would inhale, ingest or otherwise absorb VOCs;

b)  Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of VOCs, when this Defendant knew or should have known that the same would have a toxic, poisonous and highly deleterious effect upon the health of persons, such as Plaintiff, inhaling, ingesting or otherwise absorbing it;

c)  Included VOCs and/or VOC-containing ingredients in their materials and/or products, and/or specified the use of the same, when adequate substitutes were available;

d)  Failed to provide any or adequate warnings to persons, such as Plaintiff, working with and around their VOC containing products/materials of the dangers of inhaling, ingesting or otherwise absorbing the same;

e) Failed to provide any or adequate instructions concerning safe and/or safer methods of working with and around VOCs, and VOC-containing materials/products to Plaintiff and others similarly situated, including specific instructions on how to avoid inhaling, ingesting, or otherwise absorbing the same; and/or,

f) Failed to conduct tests on their respective materials /products containing VOCs to determine the hazards to which persons, such as Plaintiff, who might be exposed while working with and around the same.

10.     As a direct and proximate result of one or more of the foregoing acts or omissions on the part of UCC, Plaintiff was exposed to and inhaled, ingested, or otherwise absorbed VOCs in sufficient amount to cause CLL.

11.     As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, Plaintiff developed CLL.

12.     As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, UNION CARBIDE CORPORATION, jointly and severally, to award compensatory damages in excess of the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

### COUNT 33
### SAFETY-KLEEN SYSTEMS, INC.
### (VOC-Product Defendant: Negligence)

1.     Plaintiff incorporates by reference the paragraphs the General Allegations as if fully asserted herein.

2.     At all times herein set forth, Defendant, Safety-Kleen Systems, Inc. ("Safety-Kleen"), manufactured, sold, distributed, or supplied materials, products and/or equipment

containing and emitting VOCs including solvents and benzene, toluene, ethyl benzene, and xylene, which were being employed by Plaintiff in the manner and for the purposes for which they were intended by Safety-Kleen. These materials, products, and/or equipment included, but are not limited to, the sale, manufacture, distribution, and/or supply of: thinners, mineral spirits, solvents, degreasers, parts cleaners, parts and/or tool washing solvents, and/or parts and/or tool washing equipment.

3.     Plaintiff's exposure to and inhalation, ingestion, and absorption of VOCs from said products/materials were completely foreseeable and could or should have been anticipated by Safety-Kleen.

4.     Safety-Kleen knew or should have known the VOCs contained in their materials/products/equipment were hazardous and had a toxic, poisonous, and highly deleterious effect upon the health of persons, including Plaintiff, inhaling, ingesting, absorbing through the skin or otherwise absorbing them.

5.     Plaintiff was unaware of the hazards of exposure to VOCs, specifically the effects of long-term exposure.

6.     At all times herein relevant, Safety-Kleen had a duty to exercise reasonable care and caution for the safety of Plaintiff and others who worked with and/or around said materials/products/equipment.

7.     Defendant Safety-Kleen Systems failed to exercise ordinary care and caution for the safety of Plaintiff in one or more of the following respects:

      a)  Included VOCs and/or VOC-containing ingredients in their materials, products, and/or equipment, and/or specified the use of VOC's, even though it was completely foreseeable and could or should have been anticipated that persons, such as Plaintiff, working with or around them would inhale, ingest or otherwise absorb VOCs;

      b)  Included VOCs and/or VOC-containing ingredients in their materials,

products, and/or equipment, and/or specified the use of VOCs, when this Defendant knew or should have known that the same would have a toxic, poisonous and highly deleterious effect upon the health of persons, such as Plaintiff, inhaling, ingesting or otherwise absorbing it;

c) Included VOCs and/or VOC-containing ingredients in their materials, products, and/or equipment, and/or specified the use of the same, when adequate substitutes were available;

d) Failed to provide any or adequate warnings to persons, such as Plaintiff, working with and around their VOC containing products/materials of the dangers of inhaling, ingesting or otherwise absorbing the same;

e) Failed to provide any or adequate instructions concerning safe and/or safer methods of working with and around VOCs, and VOC-containing materials/products/equipment to Plaintiff and others similarly situated, including specific instructions on how to avoid inhaling, ingesting, or otherwise absorbing the same; and/or,

f) Failed to conduct tests on their respective materials/products/equipment containing VOCs to determine the hazards to which persons, such as Plaintiff, who might be exposed while working with and around the same.

8.     As a direct and proximate result of one or more of the foregoing acts or omissions on the part of Safety-Kleen, Plaintiff was exposed to and inhaled, ingested or otherwise absorbed VOCs in sufficient amount to cause CLL.

9.     As a direct and proximate result of said exposure, inhalation, ingestion and/or absorption, Plaintiff developed CLL.

10.     As a direct and proximate result of CLL, Plaintiff has been disabled and disfigured, compelled to expend and become liable for large sums of money for hospital, medical and other healthcare services necessary for the treatment of his CLL, and caused to experience great physical pain and mental anguish and will continue to incur these damages in the future.

WHEREFORE, Plaintiff, Jon R. Noland, prays this Court to enter judgment in his favor and against Defendant, Safety-Kleen Systems, Inc., jointly and severally, to award compensatory damages more than the jurisdictional limit for this court, and to grant such other and further relief as this Court deems appropriate.

Respectfully,

**GIANARIS TRIAL LAWYERS, LLC**

By: _/s/ Ted N. Gianaris_
    Ted N. Gianaris, IL #6237156
    Joshua A. Edelson, IL #6326848
    One Court Street
    Alton, IL 62002
    (618) 619-0010
    (618) 259-2251 (Fax)
    tgianaris@lawforpeople.com
    jedelson@lawforpeople.com
    _Attorneys for Plaintiff_